**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., Daniel Hayes, M.D., <br><br>        Plaintiff, <br><br>v. <br><br>CHARLOTTE MECKLENBURG HOPITAL AUTHORITY, d/b/a and n/k/a ATRIUM HEALTH, a North Carolina Hospital Authority <br><br>        Defendant. | Case No.: 3:16-cv-00750-GCM <br><br><br>**FIRST AMENDED COMPLAINT** <br>**and JURY DEMAND** |

NOW COMES PLAINTIFF-RELATOR, Daniel Hayes, M.D. (hereafter "Plaintiff" or "Dr. Hayes"), by and through his attorneys, and pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, and files his First Amended Complaint under 31 U.S.C. § 3730(h) of the federal False Claims Act to recover all damages, penalties and other remedies to which he is entitled and to make him whole as a result of retaliatory action taken against him by the Defendant because of his lawful acts done to stop one or more violations of the False Claims Act.[1]  Plaintiff alleges and shows the Court as follows:

<u>**OVERVIEW**</u>

1.  This is an action under the anti-retaliation provisions of the federal False Claims Act, 31 U.S.C. § 3730(h), alleging that the Defendant unlawfully retaliated against Plaintiff

---

[1] Defendant's counsel consented in writing to the filing and serving of this First Amended Complaint by email dated August 2, 2019, from Jason Mehta to Charles H. Rabon, Jr.

because of his lawful acts done and/or efforts to stop one or more violations of the federal False Claims Act. Specifically, Plaintiff alleges that he had an objectively reasonable belief that Defendant was or would be committing frauds against the government in violation of the False Claims Act; that, based on this objectively reasonable belief, Plaintiff acted on numerous occasions to try and stop the frauds; that Defendant knew about Plaintiff's protected activities; and that Defendant retaliated against Plaintiff when it terminated him for pretextual reasons because of those protected activities.

## PARTIES

2. Plaintiff-Relator Daniel Hayes, M.D. ("Plaintiff" or "Dr. Hayes") is a resident of North Carolina.

3. Defendant The Charlotte Mecklenburg Hospital Authority ("CMHA"), d/b/a and n/k/a Atrium Health, is a hospital authority organized and existing under the laws of North Carolina, with its corporate headquarters in Charlotte, North Carolina. CMHA may be served with process through its Registered Agent, Keith A. Smith, at 1111 Metropolitan Avenue, Suite 600, Charlotte, North Carolina, 28204. CMHA's flagship Charlotte facility is Carolinas Medical Center ("CMC"). Defendant is generally referred to hereafter as CMC.

## JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. §3729, *et seq*.

5. Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §3732(a) and 28 U.S.C. §1331 in that this action arises under the laws of the United States.

6. Venue is proper in this district pursuant to 31 U.S.C. §3732(a), which provides that "any action under §3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts

2

business, or in which any act proscribed by §3729 occurred."

7. The Plaintiff and Defendant both reside in this District. Further, all or substantially all of the proscribed acts, which are the subject of this action, occurred in the State of North Carolina within this judicial district.

8. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and (c).

## FACTUAL ALLEGATIONS

9. Plaintiff is a former employee of CMC, having been employed there from 1993 through 2013.

10. Plaintiff's initial contract of employment (identified as a "Professional Services Agreement") was signed on December 28, 1992. The contract recites that "Hospital desires to engage the services of a physician qualified in General Surgery to assist the Hospital in providing professional and administrative direction and supervision of its Organ Procurement Agency by serving as its Medical Director and by serving as Director of Transplantation in its Department of General Surgery." The contract stated that the initial term of the agreement was to begin on April 1, 1993.

11. After Plaintiff's initial contract of employment with CMC, the parties renewed and/or entered into subsequent contracts. The Plaintiff's last employment contract with CMC is that contract titled "Second Amended and Restated Employment Agreement," and dated October 29, 2010.

12. Upon the commencement of his employment, and over the next twenty-plus years, Plaintiff worked as a surgeon at CMC, CMHA's Charlotte flagship facility, and specifically within the CMC Transplant Center. He also served as the Director of Transplantation and Medical Director of CMC's Organ Procurement Organization,

LifeShare of the Carolinas, Inc. (hereinafter the "OPO"). In 2001, Plaintiff also was elected to a term as Chief of the Department of General Surgery.

13. At the time of his firing in 2013, Plaintiff continued to hold the positions of CMC's Director of Transplantation at the CMC Transplant Center and Medical Director of the OPO.

14. CMC has performed organ transplants since 1970. Since approximately 1993, all transplant procedures at CMC have been conducted under the Department of General Surgery.

15. Currently, CMC performs hundreds of organ transplants annually, which include heart, kidney, liver, and pancreas transplants. In the last full year for which complete data is available (2018), the CMC Transplant Center performed 119 kidney transplants, 80 liver transplants, 3 kidney/pancreas transplants, and 34 heart transplants. Patients who receive transplanted organs require ongoing monitoring, care, and treatment following the transplant surgery. This includes initial follow-ups with surgeons, as well as extensive lab work to continuously test organ function and viability.

16. The federal government provides Medicare coverage for individuals with End Stage Renal Disease ("ESRD") for defined periods of time, and including dialysis treatments and transplants. "End-Stage Renal Disease (ESRD) is a medical condition in which a person's kidneys cease functioning on a permanent basis leading to the need for a regular course of long-term dialysis or a kidney transplant to maintain life. Beneficiaries may become entitled to Medicare based on ESRD. Benefits on the basis of ESRD are for all covered services, not only those related to the kidney failure condition."

https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Coordination-of-

Benefits-and-Recovery-Overview/End-Stage-Renal-Disease-ESRD/ESRD.html  If the beneficiary has Medicare only because of ESRD, Medicare coverage continues for 12 full months after the cessation of dialysis treatments, or 36 months after the month in which the beneficiary received a kidney transplant.

17. Medicare pays for kidney transplants under what is called a "Global Surgical Package." As explained by the Center for Medicare and Medicaid Services ("CMS"),

> *The global surgical package, also called global surgery, includes all necessary services normally furnished by a surgeon before, during, and after a procedure. Medicare payment for the surgical procedure includes the preoperative, intra-operative, and post-operative services routinely performed by the surgeon or by members of the same group with the same specialty. Physicians in the same group practice who are in the same specialty must bill and be paid as though they were a single physician.*

https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/GloballSurgery-ICN907166.pdf

18. Kidney transplant surgery is considered to be a "major procedure" for which the Global Surgical Package includes one-day pre-operative service, the procedure day, and 90 days immediately following the day of the surgery.  Id.

19. Notwithstanding that CMC has performed kidney transplants for decades and received payments through Medicare under the Global Surgical Package manner of payment, CMC has lacked an on-site post-transplant clinic for its kidney transplant patients. Instead, CMC essentially "farms out" the post-transplant clinic responsibilities to the nephrology clinic that is its main source of kidney transplant referral patients, Metrolina

5

Nephrology Associates, P.A., ("MNA"), from which practice the CMC Transplant Center receives a high percentage of patient referrals for kidney transplants. On information and belief, approximately 60% of CMC Transplant Center's kidney transplant patients are referred by MNA.

20. During much of the time that Plaintiff was the Director of Transplantation, CMC and MNA performed under a unique arrangement whereby CMC purportedly paid money to MNA, relied on MNA to provide all post-transplant care at MNA's Charlotte area clinics, and referred post-transplant care responsibilities to MNA and its physicians.[2]

21. One significant problem with this arrangement was the fact that as soon as the transplant patient was discharged from CMC, the CMC physicians and transplant team (i.e., the surgical team that performed the transplant and which was expected to provide "post-operative services routinely performed by the surgeon" under the Global Surgical Package) could not even access the patient's lab work. The first labs that were drawn following transplantation were done at MNA, because there was (and is) no post-transplant clinic at the CMC Transplant Center.

22. Further, during the timeframe that Plaintiff was the Director of Transplantation, the CMC transplant surgeons could not even see the patient's post-transplant treatment records because MNA's medical record system was unavailable to CMC physicians. Plaintiff was highly concerned about this lack of post-transplant information flowing back to CMC's physicians and staff, both because of his personal involvement in transplants and

---

[2] MNA is a privately held, physician owned nephrology practice. It is not among the types of Medicare reimbursable facilities that are required or permitted to file Medicare Cost Reports to obtain reimbursement for certain otherwise unreimbursed costs in connection with participating in the Medicare program. CMC's 2012 Medicare Cost Report shows that it claimed amounts for "post-transplant clinic," though it is not specified what these amounts included. However, CMC in fact did not operate a post-transplant clinic. This indicates that CMC's Medicare Cost Reports with regard to post-transplant clinic costs are false.

6

because of his supervisory capacity as Director of Transplantation.

23. By 2010, the "dual location" care model was identified as a root cause for significant problems at CMC's Transplant Center with regard to kidney transplants. In 2010, the Transplant Center had a series of adverse outcomes including unusually high numbers of patient deaths and graft losses.

24. On some number of occasions during his tenure as the Director of Transplantation at CMC, and in particular subsequent to the bad outcomes that occurred in 2010 kidney transplant program, Plaintiff openly raised concerns with both CMC management and with MNA about the fact that post-transplant clinical care of transplant patients (including lab work and follow up work that he reasonably believed should be within the scope of the 90 day global surgical package) was being handled by MNA and not by the CMC Transplant Center – which Plaintiff believed was the appropriate location. Each time Plaintiff raised this issue, he was berated both by CMC management and by the physician owners/management of MNA that the "status quo" would remain in place. Here, "status quo" meant that the post-transplant clinical care was performed at MNA by MNA physicians, rather than at the CMC Transplant Center by the transplant physicians who performed the operation under the global surgical package.

25. Plaintiff also raised this issue directly to MNA's president, Dr. George Hart. Dr. Hart replied by saying that if there ever was to be a change in the relationship between CMC and MNA, that MNA would stop making transplant referrals to the CMC Transplant Center and instead that MNA would send their transplant patients to either Wake Forest Baptist Medical Center Transplant Center, the UNC Chapel Hill Kidney Center, or to Duke University Hospital's Kidney Transplant Program – which are other large kidney

transplant centers in North Carolina. Plaintiff understood Dr. Hart to be unwilling to give up MNA's "special relationship" that it benefitted from in return for being the principal source of kidney transplant patient referrals to CMC.

26. These conversations with Dr. Hart took place in the context of discussions around the preparation of the Mitigating Factors Request to CMS in the fall of 2012 (discussed further below), which by submission CMC ultimately promised CMS that a "consolidation" of the post-transplant clinic into one facility at CMC was being undertaken. Based in part on these conversations, Plaintiff reasonably believed, and he questioned, whether there might exist improper financial relationships between CMC and MNA that were not allowable under federal law.

27. Dr. Hart made it clear to Plaintiff that it was extremely lucrative to MNA for it (MNA) to operate the post-transplant clinic. Plaintiff reasonably understood this to mean that MNA in fact was submitting claims to CMS for its post-transplant work on CMC patients – and that MNA was separately billing Medicare for post-transplant clinical services included in the Global Surgery Package, despite the fact that CMC already had been paid under the Global Surgery Package. Plaintiff reasonably believed that such separate billings to CMS by MNA were likely fraudulent to the extent those included post-operative services supposedly included in the Global Surgery Package.

28. In anticipation of a forthcoming Statement of Deficiencies by CMS, and as part of its planned response thereto, in October 2012, CMC management had a meeting with MNA physicians regarding CMC's draft Mitigating Factors Request to CMS. Plaintiff was in attendance at this meeting. The purported reason for the meeting was for both CMC and MNA to "clear the air" regarding any disagreements so they could present a "united

8

front" to CMS regarding the continuation of the CMC kidney transplant program.

29. Plaintiff later learned that real reason for this meeting supposedly was called by CMC management was to try and make sure that Plaintiff would not raise criticisms directly to CMS about the dual location aspects of the post-transplant clinic during a planned upcoming "mitigating factors" conference call with CMS. Plaintiff reasonably believed, therefore, that CMC did not want Plaintiff to reveal potentially fraudulent practices to the government during the Mitigating Factors discussions with CMS. In other words, Plaintiff reasonably understood that CMC and MNA did not want a whistleblower on their hands and were trying to forestall that by allowing Plaintiff to "vent" ahead of time and gain his cooperation or acquiescence in the calls and meetings with CMS.

30. Due to the reforms to the transplant program promised by CMC and included in the proposed Mitigating Factors Request, and in particular due to the promised consolidation of the post-transplant clinic, Plaintiff agreed to move forward with the preparation of the Mitigating Factors Request and the anticipated calls with CMS.

31. As an expected result of the series of negative outcomes in 2010, on or about November 5, 2012, CMS sent notification to CMC advising that it was no longer in compliance with Conditions of Participation: 42 C.F.R. 482.82 – Data Submission, Clinical Experience, and Outcome Requirements for Re-approval of Transplant Centers.[3]

32. Well before the CMS notice of non-compliance in November 2012, however, Plaintiff and other CMC personnel were fully aware of the bad outcomes in 2010 and the high likelihood that CMS would issue a notice of non-compliance against them as a result.

---

[3] Plaintiff does not currently possess a copy of this enforcement action from CMS; however, it almost certainly was a CMS Form 2567, Statement of Deficiencies. When a Form 2567 Statement of Deficiencies notification is sent, the provider must respond with a Plan of Correction (or other appropriate response, such as a Mitigating Factors Request) within 30 days or else face termination as a Medicare provider.

Because it anticipated a forthcoming negative action by CMS based on the bad outcomes that occurred in 2010, CMC proactively took steps to prepare for its future response. These actions included conducting an internal Quality Assessment and Process Improvement initiative ("QAPI") to identify deficiencies in the transplant services regime and propose improvements.

33. The findings included in the QAPI were thereafter used in developing CMC's response to CMS's notice of non-compliance. This response, which was submitted to CMS on or about November 26, 2012, formally requested the "consideration of continued Medicare approval of the adult kidney transplant program based on Mitigating Factors" ("Mitigating Factors Request").[4]

34. In the Mitigating Factors Request, CMC identified the fact of the kidney transplant patients' post-transplant clinic taking place at MNA rather than at CMC as being a "root cause" of the "adverse outcomes." Specifically, the relevant root cause analysis finding reported that: "Infrastructure of the post-transplant process provided insufficient resources and communication to ensure comprehensive, integrated, multidisciplinary post-operative delivery of care."

35. CMC further described the adverse events (patient deaths and graft losses) that occurred in 2010 as an "unacceptable spike in mortality." CMC also variously referred to the problems that occurred in 2010 (i.e., the graft losses and patient deaths) as: "a sharp decline in outcomes," "the significant deterioration in the adult kidney transplant program's outcomes," "outcomes problems," and "poor outcomes."

---

[4] CMC utilized outside consultants to assist in preparing its Mitigating Factors Request, which is largely based on a study recommendation by outside consultants that CMC retained in 2010, anticipating that CMS would take action in the future.

36. CMC also described the dual location arrangement for post-operative care as "unique." The Mitigating Factors Request states: "The CMC Kidney Transplant program has a unique model for post-transplant care. The care of the recipient post-discharge occurs primarily in two locations – one for nephrology care and one for surgical care…. It was felt that this **dual-location care model produced potential difficulties** in communication between multidisciplinary team members, specifically in regard to the management of complex cases" (emphasis added).

37. The Mitigating Factors Request continued: "Process Improvement: This **problem is being addressed through** the addition of staff, **the consolidation of the post-transplant clinic in a single location** and approval for a hospital based midlevel provider to be dedicated to the kidney transplant program" (emphasis added).

38. Two of the six problematic processes identified in the Mitigating Factors Request dealt directly with CMC and MNA's post-transplant care arrangement. Issues identified included the fact that the majority of transplant graft failures occurred during the first 90 days after surgery, higher rates of infectious disease occurred due to lack of infectious disease doctors overseeing the recovery, and the fact that the off-site post-transplant clinic produced problems in the management of complex cases.

39. Plaintiff was heavily involved in the QAPI and the preparation of the Mitigating Factors Request. He attended many meetings in which the identified improvements were discussed and ultimately decided upon (including the promised consolidation of the post-transplant clinic into a single location) and which became part of the Mitigating Factors Request. In fact, Plaintiff personally pushed hard in these meetings for the consolidation of the post-transplant clinic at CMC because he saw that having the clinic separately at

11

MNA was problematic for achieving superior patient care.

40. On or about March 14, 2013, CMS accepted CMC's Mitigating Factors Request based in part on CMC's representation that the post-transplant clinic was being consolidated in a single location at the CMC Transplant Center.

41. CMS Form 2567, which is the Statement of Deficiencies and Plan of Correction form that CMS served upon CMC on or about November 5, 2012, expressly states that "[i]f deficiencies are cited, an approved plan of correction is requisite for continued program participation."   The CMS publication entitled "Process for Requesting Consideration of Mitigating Factors in the Centers for Medicare & Medicaid Services' (CMS)' Determination of Medicare Approval of Organ Transplant Programs" states that a Mitigating Factors application can be submitted and used as an appropriate Plan of Correction in response to a Statement of Deficiencies: "On the Statement of Deficiencies (Form CMS-2567), the program must state that it is planning to apply for mitigating factors as its plan of correction (POC) for non-compliance with data submission, clinical experience, or outcomes noncompliance."[5]

42. Once CMS accepted CMC's Mitigating Factors Request, Plaintiff reasonably believed that consolidation of the post-transplant clinic on site at CMC would have to be done in order for CMC to remain in compliance with CMS's conditions of participation.  Since the Mitigation Factors Request certified to the Government that the consolidation in fact was already underway, Plaintiff reasonably believed that the continued non-consolidation of the clinic at CMC would amount to a fraud on the Government, since CMS paid for

---

[5] See https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/ConsiderationofMitigatingFactors.pdf

virtually all kidney transplants done at the CMC Transplant Center.

43. Despite the fact that the Mitigating Factors Request certified that one of the significant process improvements CMC was implementing – consolidation of the post-transplant clinic in a single location – CMC did not honor its promise to the Government in the Mitigating Factors Request.

44. After the Mitigating Factors Request was accepted by CMS in March 2013, CMC essentially ceased all efforts toward consolidation of the post-transplant clinic to a single location. Plaintiff observed that CMC was lagging in its obligations to move forward with the reforms set forth in the Mitigating Factors Request.

45. In fact, in retrospect, it appears that CMC never intended to fulfill its promise to consolidate its post-transplant clinic at CMC. Once approval of the Mitigating Factors Request was received, there were no efforts undertaken to accomplish such a consolidation, nor were any further discussions of the possibility of consolidation tolerated.

46. Plaintiff objectively and reasonably believed that CMC was legally obligated to do what it promised CMS in the Mitigating Factors Request, including the consolidation of the post-transplant clinic in a single location. Therefore, in or about the late summer of 2013, Plaintiff raised the issue to Lisa McCanna, CMC Assistant Vice President for Transplant Services and CEO of CMC's OPO, and to McCanna's superior, Joyce Korzen, CMC Vice President of Operations. Plaintiff asserted that CMC should self-report to CMC that it in fact had not consolidated the post-transplant clinic as promised. This direct notification of such to CMC management amounted to protected activity under the False Claim Act, 31 U.S.C. § 3730(h), since Plaintiff's asking management that CMC self-

13

report this situation to CMS was done in an effort to stop fraud. Further, since the raising of the issue of self-reporting was made directly to CMC management, CMC was aware of Plaintiff's action in this regard.

47. Ms. McCanna's response to Plaintiff raising the issue about self-reporting CMC's failure to abide by its obligations under the accepted Mitigating Factors Request was simple and blunt. She said to Plaintiff: "No. We [CMC] will not be doing that," or words to the same effect.

48. In another meeting during the summer of 2013 also at which were present Joyce Korzen and Lisa McCanna, along with other CMC management and some MNA physicians, Plaintiff again directly raised issue about CMC's failure to fulfill its promises under the Mitigating Factors Request that had been accepted by CMS as a resolution to the Statement of Deficiencies. Plaintiff's concern was not with regard to mere regulatory violations, but rather that it was potentially fraudulent not to comply with promises and representations made to CMS in the Mitigating Factors Request. Again, Plaintiff explicitly raised the issue of the consolidation of the post-transplant clinic and also raised the issue of MNA physicians improperly utilizing CMC's 340B Drug Discount Program. The CMC officers and management present again refused to discuss these matters saying, this time, words to the effect that "we will not be discussing that," and "let's move on."

49. Because it participates in the Medicare and Medicaid programs and receives payment for services rendered to Medicare and Medicaid beneficiaries, CMC is required to file a Medicare Cost Report for its CMC operations ("MCR" or "Medicare Cost Report") each year. Hospitals participating in the Medicare program are required to file MCRs annually. 42 U.S.C. § 1395g. MCRs are filed on Form CMS-2552.

14

50. The Medicare Cost Report, CMS Form 2552, requires a certification by an officer or administrator of the Hospitals that the cost report is "true, correct, complete" and that it is "prepared . . . in accordance with applicable instructions, except as noted." It also requires a certification that "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." The purpose of the Medicare Cost Report is to provide information supporting the hospital's claim for reimbursement by Medicare (CMS) for certain administrative and other indirect costs that are necessary for the operation of the hospital, but which are not directly reimbursable by Medicare through fees for services.

51. The submission of a Medicare Cost Report constitutes the submission of a claim for payment. When the Medicare Cost Report contains false, overstated charges, a false claim has been submitted to the United States.

52. In Plaintiff's capacity as CMC's Director of Transplantation and Medical Director of the OPO, as well as his position as Chief of the Department of General Surgery, Plaintiff was heavily involved in all aspects of the running of Transplant Center.

53. A substantial percentage of Plaintiff's duties, and of his time, was incurred and billed as administrative time as opposed to clinical time. Consequently, as surgeon, Director of Transplantation, and Medical Director of the OPO, Plaintiff had firsthand knowledge of the amount of his own administrative and clinical duties, and the processes for carrying out these responsibilities. Plaintiff also was and is aware of the duty to make accurate, truthful, and complete reports when claims for payment are submitted to the United States for payment.

15

54. While Plaintiff personally did not participate in the compilation (apart from his own time studies) or submission of CMC's Medicare Cost Reports, he was aware of the fact that CMC submitted such reports. He was generally aware of the process by which CMC would capture information from himself and physicians within the Transplant Center for the purpose of submitting the Medicare Cost Reports, certify those Medicare Cost Reports to be in compliance with all CMS requirements of participation and payment, and receive reimbursement from CMS for allowable costs.

55. Despite the fact that in 2012, CMC did <u>not</u> operate an on-site post-transplant clinic for its kidney transplant patients, the 2012 Medicare Cost Report included expenses, allocations and adjustments as if CMC did, in fact, operate an on-site post-transplant clinic. Like other aspects of its MCR's, on information and belief CMC was paid by Medicare on those claims.

56. Between 2010 and 2012, CMC began instituting a new "productivity-based" compensation model described as "relative value units" (the "RVU System").

57. Under the RVU System, Plaintiff was expected to attain a certain number of clinical RVUs to cover a substantial part of his salary. At the same time, Plaintiff's duties as the Director of Transplantation (along with his other non-clinical duties), required a substantial amount of time, and Plaintiff became concerned that he could not accommodate both the required administrative duties and at the same achieve the expected number of RVUs.

58. Plaintiff participated in a meeting in the early fall of 2012 between himself and Robin Surane, Vice President for CMC's transplant program and OPO. At this meeting it was discussed how approximately 60% of Plaintiff's time was historically spent on

16

administrative tasks, and 40% spent billing for clinical services.  In order to perform under the new RVU System, Plaintiff would have to almost double his clinical billable services rendered each year while maintaining his same administrative responsibilities, which objectively was not possible.

59. When Plaintiff asked Ms. Surane how this could possibly be done, Ms. Surane chuckled, and responded that Plaintiff should "be more like Dr. XXXX" a certain CMC physician known among clinical staff and CMC management for excessively high billables. Specifically, on information and belief, it was widely understood (even to Ms. Surane) that Dr. XXXX violated Medicare rules and regulations by, among other things, billing for surgeries where he did not "scrub in" (i.e., surgeries for which he did not personally participate).

60. Ms. Surane made it clear that in order to comply with the new RVU System, Plaintiff should record and bill his clinical time in whatever manner was necessary to make it work, regardless of how unethical, untrue or fraudulent that might be.  She maintained that each physician was required to bill in excess of $2 million each year regardless of circumstances or administrative responsibilities.  In response, Plaintiff asserted that this kind of thing would be fraudulent and that he would not do such things.  By this assertion, Plaintiff was taking action to try and stop CMC from perpetrating frauds on the government, and therefore his actions constituted protected activity under the False Claims Act.  The false reporting of clinical time by physicians was something that could affect claims and payments on Medicare Cost Reports.

61. In a follow-up meeting on the subject of RVUs with Dr. Scott Furney, Chair of the Department of Medicine, the issue of billable productivity again came up as did the

17

reference to the same physician known for excessively high billables. Plaintiff expressed his objectively reasonable belief that demanding such billables from its physicians was tantamount to asking the physicians to commit fraud, and he made it clear to Dr. Furney that he would not engage in such billing practices and that he would not support other CMC physicians who did. Plaintiff further explicitly stated at this meeting that he would truthfully report these issues in the context of any government investigation into the hospital's billing practices; in other words, if any government agency investigated the hospital's billing practices in the future, Plaintiff would fully and truthfully report these issues to the government and would respond to inquiries fully and truthfully, without gloss or omission. Plaintiff's assertions to Dr. Furney in this meeting were based on his objectively reasonable belief that CMC was engaged in fraud against the Government and were designed to stop CMC from committing that fraud. As such, Plaintiff was engaging in protected activity under the False Claims Act.

62. From this and the many other like communications from Plaintiff to CMC described in this Complaint, there can be no doubt that Defendant had full, actual knowledge that Plaintiff reasonably believed that CMC was engaged in fraudulent activity, that Plaintiff was acting to try and stop it through his protected activity, and that CMC knew about his protected activity.

63. Plaintiff was particularly sensitive to the potential risks of this new system as he was the lead administrator for the entire Transplant Center. He, along with all the other transplant surgeons were required by CMHS to complete Medicare Cost Report timesheets, and CMC included these amounts in its Cost Reports despite the fact that these timesheets should not have been completed for surgery-related time. Plaintiff also objected to this

18

requirement from CMC on his own behalf and in his capacity of Director of Transplantation because he knew the timesheets were inappropriate and reasonably believed them to be in furtherance of a scheme to defraud the Government.

64. CMC, through its Medicare Cost Report accountant, instructed CMC physicians on what to include on their timesheets (which were used ultimately to provide the backup data for the Medicare Cost Reports). Physicians were told to include things on timesheets that amounted to time exaggerations and to include things under pre-transplant administration time that were in excess of allowed limits. Plaintiff reasonably believed that these requirements by CMC were fraudulent because this data would be used in CMC's Medicare Cost Reports and thereby would be used to ask the federal government to pay reimbursements to CMC to which it was not entitled. In numerous conversations with CMC administrators and at meetings involving CMC physicians and staff, Plaintiff alerted his superiors at CMC that he reasonably believed their asking him and other physicians to falsify their timesheets was illegal and designed to facilitate fraudulent claims for payment to CMS. As such, these conversations constituted protected activity under the False Claims Act by which Plaintiff was acting to try and stop fraud against the government. Here again, CMC was aware that Plaintiff was engaging in protected activity.

65. In February 2012, Plaintiff met with Sarah Herring and Dave Bowman, (both CMC employees responsible for CMC's Medicare Cost Report accounting and compliance), to discuss his concerns with the Medicare Cost Report time allocation practices.

66. In this meeting, Plaintiff raised his objectively reasonable belief that what CMC was requesting of the transplant surgeons in general and of himself in particular was illegal

19

and would lead to fraudulent requests for payment to the Government. Nonetheless, Plaintiff was instructed to continue reporting his time as instructed. Again, Plaintiff's raising of his objections to the Medicare Cost Report time allocation practices was action on Plaintiff's part to try and stop CMC fraud on the government and thereby constituted protected activity under the False Claims Act. And again, CMC was aware that Plaintiff was engaging in protected activity.

67. CMC also gave nominal administrative titles to each transplant surgeon on its staff for the sole purpose of inappropriately allocating a portion of their salaries as administrative expenses and included these amounts on its Cost Reports. Plaintiff questioned these nominal titles at the time because he reasonably believed them to be in furtherance of a scheme to defraud the Government. This questioning is another example of Plaintiff's protected activity under the False Claims Act by which he was attempting to stop CMC from committing fraud on the Government; Defendant knew about Plaintiff's protected activity.

68. Upon information and belief, CMC inappropriately accounted for Plaintiff' entire salary as an expense on its annual Cost Reports. In its 2012 Cost Report, CMC reports an amount approximately identical to Plaintiff's compensation as an expense allocated from CMC's surgery department to its OPO. Plaintiff was aware of this allocation of his salary on the Cost Report at the time, and he objected to it because he reasonably believed it to be illegal and a fraudulent claim for payment from the Government. Plaintiff's objection was designed to try and stop CMC from committing fraud on the government and therefore was protected activity under the False Claims Act. CMC knew of Plaintiff's protected activity because he directly raised the issues.

69. Without any prior notice or warning, Plaintiff's employment was terminated on October 28, 2013, at a meeting that he had requested to address irreconcilable demands between his administrative responsibilities as Director of Transplantation and CMC'S newly implemented RVU System.

70. Prior to this point, Plaintiff had always received performance reviews indicating his performance had never been less than satisfactory, and was more often considered exceptional.

71. At the meeting at which he was terminated, Plaintiff was informed that the alleged reason for his immediate termination were that he had falsified time records relating to his vacation time. CMC representatives claimed that Plaintiff had wrongfully allocated three days of his vacation time as being marked education leave in July 2013.

72. The time sheet form for claiming the time off included vacation time and education leave on adjacent boxes and, upon information and belief, the wrong box had been inadvertently checked for the days in question. Pursuant to the terms of his Employment Agreement, CMC was required to provide notice and an opportunity to cure any such defects. Nevertheless, CMC informed Plaintiff he was terminated immediately with no notice, no opportunity to cure any mistake in the time records, and no payment of his contractual right to 90 days' pay after notice of termination.

73. In fact, the reason given for Plaintiff's termination was purely pretextual. The alleged falsification of time for which his entire career was terminated supposedly was for the days of July 3 through July 5, 2013 (which included the July 4 Independence Day holiday). That this was an inadvertent mistake should have been obvious to CMC, as there almost certainly would have been no medical educational conference scheduled for

July 4th.  More importantly, the Transplant Surgeon Call Schedule for the month of July

2013, which was published before the start of the month of July 2013, notes that Dr.

Hayes was out on vacation between July 2nd and July 20th of 2013 for his honeymoon.

The assertion that one small inadvertent mistake on a time sheet was enough to warrant

CMC terminating Plaintiff despite his 20 years of exemplary service to the institution is,

on its face, ludicrous.  Plaintiff understood immediately upon his firing that the real

reason CMC was firing him was because he would not give up on his objections to the

fraud in which CMC was engaged.

74. The true reason Plaintiff was terminated was because of his efforts to stop CMC and

MNA from committing fraud on the government, which is protected activity under the

False Claims Act.  Plaintiff was fired mere weeks after the meeting with Lisa McCanna

and Joyce Korzen in which he had specifically told those CMC managers that CMC

should self-report its non-compliance with the promise made in the Mitigating Factors

Request to consolidate the post-transplant clinic in single location at the CMC Transplant

Center.

75. In actuality, by firing Plaintiff for a pretextual reason, CMC took an adverse action

against Plaintiff because he engaged in protected activity in an attempt to stop fraud

against the Government – activity that is protected under by federal law, and for which a

remedy lies under the False Claims Act.

76. The proximity in time between this protected activity and CMC's firing of Plaintiff

clearly supports the assertion that Plaintiff was fired **because of** his protected activity.

**But for** his protected activity, Plaintiff, an esteemed 20+ year board certified and

fellowship trained surgeon, Director of the CMC Transplant Center, and Medical

Director of the OPO, would not have been terminated by CMC, and the timeline of events readily supports a reasonable inference that CMC terminated him because of his protected activity.

77. Likewise, as discussed elsewhere above in this Amended Complaint, Plaintiff had overtly engaged in many other instances of protected activity by boldly speaking up to CMC management about issues that he reasonably believed amounted to violations of the False Claims Act.  His protected activity was the actual reason Plaintiff was fired; but for that activity, he would not have been fired.

**CLAIM FOR RELIEF**
(FOR RETALIATION IN VIOLATION
OF THE FALSE CLAIMS ACT – 31 U.S.C. §3730(h))

78. The allegations of all paragraphs in this Complaint are incorporated by reference.

79. In performing the acts described above, the Defendant by and through its own acts, or through the acts of its agents, servants, officers, and employees, unlawfully retaliated against Plaintiff in violation of 31 U.S.C. §3730(h).

80. Specifically, the Defendant CMHA terminated Plaintiff because he was engaging in protected activity pursuant to 31 U.S.C. §3730(h).  As a result of the Defendant CMHAs' unlawful retaliation, Plaintiff is entitled to recover for all of the damages he has suffered in amounts to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff prays as follows:

1. That Defendant be found to have violated and be enjoined from future violations of 31 U.S.C. § 3730(h);

2. That Plaintiff be awarded all relief to which he is entitled pursuant to 31 U.S.C. §3730(h);

3. That Plaintiff be awarded all costs of this action, together with all expert witness fees, attorneys' fees, and court costs, as fully as is allowed by law;

4. That the Plaintiff be awarded prejudgment interest;

5. That a trial by jury be held on all issues; and

6. That the Plaintiff receive all relief, both in law and in equity, to which he may reasonably be entitled.

This the 6th day of August, 2019.

**RABON LAW FIRM, PLLC**

*/s/ Charles H. Rabon, Jr.*
Charles H. Rabon, Jr.
N.C. State Bar No. 16800
crabon@usfraudattorneys.com
Gregory D. Whitaker
N.C. State Bar No. 51065
gwhitaker@usfraudattorneys.com
225 E. Worthington Ave.
Suite 100
Charlotte, NC 28203
Tel. 704-247-3247
Fax 704-208-4645

**VAN KAMPEN LAW, PC**

Joshua R. Van Kampen
NC Bar No. 32168
josh@vankampenlaw.com
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: 704-247-3245
Fax: 704-749-2638

**CERTIFICATE OF SERVICE**

I certify that on the date listed below Plaintiff's **FIRST AMENDED COMPLAINT and JURY DEMAND** was filed with the Clerk of Court by using the ECF system, which will send Notice of Electronic Filing to all participants in the case who are registered users.

Dated: August 6, 2019

**RABON LAW FIRM, PLLC**

*/s/ Charles H. Rabon, Jr.*
Charles H. Rabon, Jr.