# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., Daniel H. Hayes, M.D., | |
| Plaintiff, | |
| v. | Case No.: 3:16-cv-00750-GCM |
| THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY, d/b/a and n/k/a ATRIUM HEALTH, a North Carolina Public Hospital Authority, | **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

Pursuant to Local Civil Rule 7.1(c), Defendant The Charlotte-Mecklenburg Hospital Authority, d/b/a and n/k/a Atrium Health ("Atrium") submits this Brief in Support of its Motion for Summary Judgment on Plaintiff's claim for Retaliation under the False Claims Act, 31 U.S.C. § 3730(h).

## <u>INTRODUCTION</u>

In his Complaint, Plaintiff Daniel H. Hayes, M.D. ("Dr. Hayes") portrays himself as a "whistleblower" wrongfully terminated by Atrium for raising concerns to management of systematic fraud within Atrium's transplant department – the very same division he led as the Director of Transplantation. In fact, all of Dr. Hayes's purported concerns are entirely unfounded, have nothing to do with any purported "fraud," and appear to be nothing more than self-serving explanations concocted after-the-fact for his termination. Dr. Hayes, despite making close to $1 million a year and holding the title of Director of Transplantation, was a poor leader who claimed to spend an inordinate amount of time on administrative work, but was absent when

his colleagues needed him. After concerns about his leadership and presence in the department came to light, Atrium conducted an internal investigation in which it determined that Dr. Hayes, an at-will employee, had taken excessive vacation in violation of Atrium's policy and engaged in inaccurate and imprecise time-keeping practices that subjected Atrium to increased risk. For all of these reasons, not his purported complaints of "Medicare fraud," Dr. Hayes was terminated.

Now, Dr. Hayes claims that the real reason he was terminated was retaliation for being a whistleblower. Yet, he cannot identify a <u>single</u> written communication where he raised any concerns about potential fraud against the government, he cannot establish that the individuals at Atrium who were involved in the decision to terminate him even knew about his purported concerns, and he cannot point to any evidence that would suggest retaliation was the reason he was terminated. In fact, not only did Dr. Hayes never report his purported fraud concerns to the government while he was leading the division purportedly engaged in the fraud, it was not until <u>approximately two years after</u> his termination, and after he decided to instigate this lawsuit, that he reported his concerns to the government.

Dr. Hayes's claim should be seen for what it is – an after the fact attempt to transform internal grumblings into a False Claims Act Retaliation claim based on nothing more than his own self-serving and uncorroborated opinion. As discussed below, the False Claims Act, as a matter of law, requires more. Accordingly, Atrium is entitled to summary judgment in its favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Dr. Hayes's Tenure at Atrium

Dr. Hayes joined Atrium in 1993 as a kidney transplant surgeon tasked with the responsibility of taking over and leading Atrium's growing transplant department. (Hayes Dep.

(Ex. 1) at 48-50, 130-31.)[1]  From 1993 to October 2013, Dr. Hayes lead Atrium's transplant program as its Director of Transplantation and as the Medical Director of Atrium's organ procurement organization, LifeShare of the Carolinas, Inc. ("LifeShare").  (Hayes Dep. (Ex. 1) at 49, 60; First Am. Compl. (ECF No. 22) ¶¶ 12-13.)   During his tenure, Dr. Hayes led the kidney transplant program, started liver and pancreas transplant programs, and upgraded LifeShare. (Hayes Dep. (Ex. 1) at 130-31.)  In his last year of employment with Atrium, Dr. Hayes's total compensation package was $920,983.  (Furney Dep. (Ex. 2) at 102-04.)

With respect to the kidney transplant program in particular, from the time Dr. Hayes joined Atrium through today, Atrium partnered with Metrolina Nephrology Associates, P.A. ("Metrolina), a local nephrology clinic, to provide kidney transplant patients with surgical and nephrology care.  (Hayes Dep. (Ex. 1) at 131-32.)  In particular, Metrolina refers potential transplant patients to Atrium, and Atrium sends its kidney transplant patients to Metrolina after discharge to receive post-transplant nephrology care.  (Hayes Dep. (Ex. 1) at 37-39, 131-32.) Atrium described this arrangement to the Center for Medicaid and Medicare Services ("CMS") as a "unique model for post-transplant care [in which] [t]he care of the recipient post-discharge occurs primarily in two locations – one for nephrology care [and] one for surgical care."  (Hayes Dep. (Ex. 1) at 86, Ex. 7 at CMHA 000488-489.)

Even before Dr. Hayes started at Atrium in 1993, Dr. Hayes raised clinical questions about this "dual-location care model."  (Hayes Dep. (Ex. 1) at 37-40, 131-32.)   In particular, Dr. Hayes believed it would be better for patient care and patient outcomes if all post-transplant care, both surgical and nephrology, were consolidated in a single location.  (Hayes Dep. (Ex. 1) at 37-

---

[1] Excerpts from the deposition transcripts cited in this Brief are being filed as a separate attachment to this Brief in accordance with Local Civil Rule 7.1(c)(3).

40, 114, 131-32.)  Accordingly, as the Director of Transplantation, Dr. Hayes pushed Atrium throughout his entire tenure to consolidate the post-transplant clinic at Atrium's main hospital. (Hayes Dep. (Ex. 1) at 37-40, 104-115.)  To date, Atrium's administration, for numerous appropriate reasons,[2] has decided not to consolidate the post-transplant clinic in one location, despite knowing that was Dr. Hayes's personal preference and recommendation, as well as the preference of his successor, who currently leads the department.  (Hayes Dep. (Ex. 1) at 37-39; Casingal Dep. (Ex. 3) at 8-10, 52-55.)

**B.** **The 2012 CMS Deficiencies Letter and Atrium's Mitigating Factors**

In 2010, Atrium's kidney transplant program, under Dr. Hayes's leadership, experienced a higher-than-normal rate of patient deaths and kidney failures.  (Hayes Dep. (Ex. 1) at 21-23; McCanna Dep. (Ex. 4) at 42-43, 48-51.)  As a result, Atrium's kidney transplant was in "trouble" and at risk of losing its Medicare funding.  (Hayes Dep. (Ex. 1) at 21; McCanna Dep. (Ex. 4) 47-48.)  In particular, CMS reviews patient outcomes to assure that providers meet a certain objective standard.  If a kidney transplant program's outcomes fall two standard deviations below the national averages for patient outcomes, CMS flags the program, sends the program a notice of deficiency letter (the "Notice of Deficiency"), and gives the program an opportunity to respond as to why it should remain eligible for Medicare funding.  (Hayes Dep. (Ex. 1) at 21-23, 83-86.)  In other words, CMS requires the program to demonstrate how it will meet the objective standard.

Since it is an objective standard, Dr. Hayes and others in Atrium's kidney transplant program knew in 2010 that these poor outcomes would be "flagged" and trigger a Notice of

---

[2] Among other things, Atrium cannot force Metrolina to combine the clinics, and Metrolina does not want to do so.

Deficiency.  (Hayes Dep. (Ex. 1) at 21-23, 83-86; McCanna Dep. (Ex. 4) at 48-50.)

Accordingly, well before receiving a Notice of Deficiency, Atrium immediately began taking

steps to improve its patient outcomes to meet or exceed the CMS standards.  (Hayes Dep. (Ex. 1)

at 23, 87; McCanna Dep. (Ex. 4) at 50-51.)  Because of a lag in reporting, Atrium did not

actually receive the Notice of Deficiency from CMS until two years later, on October 30, 2012.

(Hayes Dep. (Ex. 1) at 82-84, Ex. 6.)  By that time, Atrium had already implemented numerous

process improvements and brought its patient outcomes back into compliance with CMS

requirements.  (Hayes Dep. (Ex. 1) at 23, 87–89, 92-93.)

    In the Notice of Deficiency, CMS advised Atrium that it "did not meet the requirements

for participation in the Medicare Organ Transplant Program" because of poor patient outcomes.

(Hayes Dep. (Ex. 1) at 82-83, Ex. 6.)  CMS gave Atrium the option of requesting approval for

continued participation in Medicare based on mitigating factors (the "Mitigating Factors

Request").  (Hayes Dep. (Ex. 1) at 85-87, Ex. 6; McCanna Dep. (Ex. 4) at 73.)  By regulation,

the "mitigating factors" that CMS considers include, but are not limited to, three general areas:

(i) "the extent to which outcome measures are met or exceeded;" (ii) "the availability of

Medicare-approved transplant centers in the area;" and (iii) "extenuating circumstances that may

have a temporary effect on meeting the Conditions of Participation."  (Hayes Dep. (Ex. 1), Ex. 6

at CMHA 000301.)

    Atrium submitted its Mitigating Factors Request to CMS on November 27, 2012.  (Hayes

Dep. (Ex. 1) at 86-87, Ex. 7.)  The Mitigating Factors Request contained numerous data charts

showing how Atrium's outcomes had improved since 2010, and provided detailed explanations

of the many areas where it had already made improvements to its kidney transplant program such

that it outcomes were back in compliance.  (Hayes Dep. (Ex. 1) at 92-107, Ex. 7.)  For example,

5

in the Mitigating Factors Request, Atrium told CMS that it had (i) "implemented [new] screening tool[s]" for transplant recipients; (ii) "standardized [surgical technique] across the program; and (iii) "revised our immune suppression protocols," among others. (Hayes Dep. (Ex. 1), Ex. 7 at CMHA 000482-485.) In addition to these already implemented improvements, Atrium also identified various other areas where it was exploring possible, additional improvements, including the possibility of consolidating the post-transplant clinic at a single location (although Atrium never committed to an actual consolidation).

In particular, Atrium stated that "[t]he program is currently evaluating options and working on a plan to consolidate care in one location for all aspects of post-transplant patient management." (Hayes Dep. (Ex. 1) at 105-07, Ex. 7.) This statement was true, as Atrium did in fact discuss plans to consolidate its transplant program in one location. (Hayes Dep. (Ex. 1) at 109-11; McCanna Dep. (Ex. 4) at 139, 148, Ex. 44; Casingal Dep. (Ex. 3) at 90.) Indeed, Dr. Hayes testified that Atrium spent "a lot of time and energy looking into the options." (Hayes Dep. (Ex. 1) at 109.) Those plans, however, did not come to fruition. (Hayes Dep. (Ex. 1) at 105.) Dr. Hayes believes it was ultimately Metrolina, not Atrium, that "squashed it completely." (Hayes Dep. (Ex. 1) at 111.)

Atrium did, however, implement changes to address the specific concerns it had with respect to the "dual-location care model." In particular, these concerns related to "potential difficulties in communication." Atrium put in place a multidisciplinary round where surgeons and nephrologists saw patients together and had a daily huddle where they reviewed all patients who had been transplanted in the last 90 days. (McCanna Dep. (Ex. 4) at 139.) Atrium also paid for licenses for Atrium's surgeons and nurses to access Metrolina's electronic medical records. (McCanna Dep. (Ex. 4) at 140.) Finally, Atrium hired a post-transplant nurse coordinator who

6

served as a single point of contact for the patient and made rounds with the nephrologist at Metrolina. (McCanna Dep. (Ex. 4) at 68, 171.) All of these changes were made for the purposes of ensuring that the "difficulties in communication" caused by being in two locations were remedied.

On March 27, 2013, CMS notified Atrium in writing that its Mitigating Factors Request had been accepted and approved the transplant program for continued participation in Medicare. (McCanna Dep. (Ex. 4) at 158, Ex. 45.) CMS's acceptance letter notes that Atrium "has made substantial changes toward improving patient outcomes" and "has implemented corrective actions to address the identified causes of poor outcomes." (McCanna Dep. (Ex. 4), Ex. 45 (emphasis added).) CMS further states that "[o]n this basis [i.e., the already implemented actions and improved outcomes], CMS grants the request for approval on the basis for mitigating factors." (McCanna Dep. (Ex. 4), Ex. 45.) The letter makes no mention of Atrium's "plan" to consolidate post-transplant care in a single location at some point in the future.

### C.    Dr. Hayes's Performance Issues at Atrium

In 2011, Dr. Scott Furney, in his role as the Medical Director of the Faculty Physician Network, began a review of Atrium's new physician compensation system to ensure that its 45 to 50 medical directors, including Dr. Hayes, were being treated consistently and fairly across all specialties. (Furney Dep. (Ex. 2) at 57-58, 76-77.) As part of this review, Dr. Furney reviewed documentation of time spent by every medical director at Atrium to ensure their time was accurate. (Furney Dep. (Ex. 2) at 80.)

In the process of conducting this review, Dr. Furney found Dr. Hayes's time records concerning. (Furney Dep. (Ex. 2) at 73-90, Exs. 61-62.) In particular, in Dr. Hayes's 2011 time studies, which were used to prepare Atrium's Medicare Cost Report, Dr. Hayes claimed that

69% of his time was spent on administrative matters. (Furney Dep. (Ex. 2) at 83-84, Ex. 65.) At the same time, Dr. Furney had been told by Dr. Hayes's administrative colleagues in the transplant department that they had concerns about Dr. Hayes's lack of presence and leadership. (Furney Dep. (Ex. 2) at 87-89.) For example, Lisa McCanna, who was Assistant Vice President for Transplant Services and Dr. Hayes's closest administrative colleague, raised concerns that Dr. Hayes was taking excessive time off based on his frequent absence and that had missed important meetings. (McCanna Dep. (Ex. 4) at 23, 215, 242-43.) Similarly, Dr. Furney spoke with Dr. George Hart, the President of Metrolina, about Dr. Hayes's poor performance and their "dysfunctional relationship." (Furney Dep. (Ex. 2) at 85-92, Ex. 62.)

Faced with a disconnect between the amount of time Dr. Hayes was reporting as administrative time and the concerns raised by his administrative colleagues, Dr. Furney reviewed Dr. Hayes's time studies, his call schedule, and his Outlook calendar from 2012. (Furney Dep. (Ex. 2) at 92-93.) Based on this review, it appeared to Dr. Furney that Dr. Hayes had taken over 50 days of vacation in the first half of 2012 – in violation of Atrium's vacation policy. (Furney Dep. (Ex. 2) at 96-98, 106-109, 117, 144, Exs. 64, 66, 68.) Upon reviewing this information, Dr. Furney then asked Atrium's Chief Compliance Officer to review the relevant documentation to corroborate his concerns about Dr. Hayes's timekeeping and lack of presence. (Furney Dep. (Ex. 2) at 136-37, Ex. 71.) During this review, Atrium's Chief Compliance Officer determined, among other things, that (i) Dr. Hayes's January 2013 time study indicated that he was at a conference for 8 hours on January 18, when he did not actually attend the conference on that day; and (ii) Dr. Hayes's July 2013 time report incorrectly stated that he was on educational leave for three days, when in fact he was on vacation. (Hayes Dep. (Ex. 1) at 29-30; Furney Dep. (Ex. 2) at 148-55, Ex. 71.) Dr. Furney believed these errors were, at worst,

falsification, and, at best, extremely sloppy mistakes in a high-risk area. (Furney Dep. (Ex. 2) at 150-51.) In particular, because time records are used as source documents to support Atrium's requests for Medicare reimbursement, Dr. Furney was concerned, and the compliance department confirmed, that these types of irregularities put Atrium at risk in the event of an audit by CMS. (Furney Dep. (Ex. 2) at 140, 148, Ex. 35, 74 ("While we are not at immediate risk of Medicare overpayment penalties, if we were audited we would not pass.").)

### D. Dr. Hayes's Termination from Atrium

Based on the information discovered during his review, including the concerns expressed that Dr. Hayes was a poor and largely absent leader, Dr. Furney determined that he would recommend to Dr. Mary Hall, as the Interim Chief Academic Officer and ultimate decisionmaker at Atrium, that Dr. Hayes be terminated. (Furney Dep. (Ex. 2) at 106-107, 119-120, 156-57.) Before presenting his recommendation, Dr. Furney collected the necessary "documentation" needed for Dr. Hall to make a "complete decision." (Furney Dep. (Ex. 2) at 119-20.) In particular, Dr. Furney asked Lisa McCanna to prepare an evaluation reviewing Dr. Hayes, in which she indicated that his performance was "poor" or "below expectations" in 6 of the 8 performance categories related to his administrative responsibilities. (McCanna Dep. (Ex. 4) at 235-242, Ex. 53.) In addition, Ms. McCanna provided Dr. Furney with emails going back to 2012 from Dr. Hayes's colleagues documenting their concerns about his leadership and highlighting performance issues and missed meetings. (Furney Dep. (Ex. 2) at 118-120, Ex. 69.) A June 2012 email thread between several of his colleagues notes that Dr. Hayes cancelled his attendance at an event to go to the beach, "Dr. Hayes is taking advantage of the situation with respect to time off," and that "issues such as this should not wait for the next chair." (Furney Dep. (Ex. 2) at 118-120, Ex. 69.) Finally, Dr. Furney looped in Human Resources to receive its

9

input and concurrence on the immediate termination recommendation. (Furney Dep. (Ex. 2) at 156-162, Ex. 72.)

Ultimately, after gathering all of the documentation he believed to be relevant, Dr. Furney presented his recommendation to terminate Dr. Hayes to Dr. Hall on or about October 18, 2013. (Furney Dep. (Ex. 2) at 164-167, Ex. 74.) Based on this recommendation, and with the approval of Paul Franz, Atrium's Executive Vice President, Dr. Hall made the decision to terminate Dr. Hayes. (Hall Dep. (Ex. 5) at 23, Ex. 74.) Dr. Hall and Dr. Furney met with Dr. Hayes on October 28, 2013 and advised him that he was being terminated immediately "with cause." (Furney Dep. (Ex. 2) at 174, Ex. 76.) During the meeting, Dr. Furney raised Dr. Hayes's incorrect time studies as a basis for his termination. (Hayes Dep. (Ex. 1) at 61.) In addition, in another meeting two weeks later, Dr. Furney advised Dr. Hayes that there were also "leadership issues" that had factored into Atrium's decision to terminate him. (Hayes Dep. (Ex. 1) at 63-64.)

Importantly, there is no evidence in the record that Dr. Furney, Dr. Hall, or Paul Franz (the decision-makers) were ever aware of any concerns that had been raised by Dr. Hayes about the propriety of the kidney transplant department's relationship with Metrolina, Dr. Hayes's desire to consolidate the post-transplant clinic at Atrium, or any other purported concerns Dr. Hayes now claims he had about potential fraud against the government by Atrium. (Hayes Dep. (Ex. 1) at 122-26; Furney Dep. (Ex. 2) at 90; Hall Dep. (Ex. 5) at 98.) In fact, Dr. Furney, Dr. Hall, nor Mr. Franz had ever spoken to Dr. Hayes about any of these issues prior to making the decision to terminate Dr. Hayes.

E.     **Dr. Hayes's Purported "Concerns" of Government Fraud at Atrium**

In this lawsuit, Dr. Hayes alleges that Atrium's stated justifications for his termination are pre-text, and that he was actually terminated because he had raised "significant concerns over a

10

period of time about conduct by Atrium that [he] reasonably and objectively believed was illicit and which resulted in false claims to the Government." (Pl.'s Resp. to Interrog. No. 13 (Ex. 6).) Dr. Hayes believes that he "was a thorn in their side" and that "they wanted to get rid of [him] because of all the issues [he] kept raising." (Hayes Dep. (Ex. 1) at 76-78.)

According to Dr. Hayes, these issues included the following:

    i.     A claim that Atrium had misrepresented in its Mitigating Factors Request that the post-transplant clinic would be consolidated at a single location (Hayes Dep. (Ex. 1) at 37, 74-75, 113, 120);

    ii.    A concern that Atrium and Metrolina may have been double-billing Medicare for reimbursement related to post-transplant services (Hayes Dep. (Ex. 1) at 113, 133-34); and

    iii.   A concern that Atrium's practice of allowing kidney transplant patients to utilize Atrium's 340B pharmacy to receive discount drug prices after they were discharged from Atrium did not comply with the regulatory conditions for participating in Medicare's discount drug pricing program (Hayes Dep. (Ex. 1) at 126-128).

Although Dr. Hayes claims he raised these concerns with Atrium management throughout his twenty-year tenure at Atrium, there is no written documentation evidencing these or any other concerns of potential government fraud raised by Dr. Hayes. (Hayes Dep. (Ex. 1) at 34, 41-43.) Similarly, although Dr. Hayes claims that Atrium "was concerned about my knowledge and what I might do with that knowledge" (Hayes Dep. (Ex. 1) at 76), there is not a single e-mail indicating that Atrium terminated Dr. Hayes because he might raise his concerns with the government. (Hayes Dep. (Ex. 1) at 34.)

To the contrary, Dr. Hayes did not raise his purported concerns with the government until "a couple of years" after his termination, and only then after his attorney told him that he "felt that there was a violation of federal law and referred the case to the U.S. Attorney." (Hayes Dep. (Ex. 1) at 7-11, 135-36.) After receiving the referral from Dr. Hayes's attorney, the federal

11

government thoroughly investigated Atrium and declined to pursue any claims against it relating to Dr. Hayes's purported concerns. (Hayes Dep. (Ex. 1) at 10-11.)

Nonetheless, in this lawsuit, Dr. Hayes claims that Atrium decided to terminate him based on purported concerns that he never once raised in writing and never reported to the federal government until years after his termination.

## STANDARD OF REVIEW

Summary judgment should be granted if Atrium "shows that there is no genuine dispute as to any material fact" and that "it is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Atrium bears the initial burden of showing the absence of a genuine dispute, and may meet this burden by showing "an absence of evidence to support the non-moving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Once Atrium meets this burden, Dr. Hayes must come forward with evidence beyond the pleadings "showing that there is a genuine issue [of material fact] for trial." *Id.* at 325.

In considering Atrium's Motion for Summary Judgment, the Court must view the evidence and the inferences to be drawn therefrom in the light most favorable to Dr. Hayes. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). That said, "[p]ermissible inferences must . . . be within the range of reasonable probability . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quotation omitted). Dr. Hayes's "self-serving opinion[s] . . . cannot, <u>absent objective corroboration</u>, defeat summary judgment." *See id.* (emphasis added) (quotation omitted).

12

## ARGUMENT

To establish a claim for Retaliation under the False Claims Act, Dr. Hayes "must establish [that] (1) [he] engaged in a protected activity; (2) [Atrium] knew about the protected activity; and (3) [Atrium] took adverse action against [him] as a result." *See Skibo v. Greer Laboratories, Inc.*, No. 19-2042, 2021 WL 72124, at *6 (4th Cir. Jan. 8, 2021) (quoting *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018)). Dr. Hayes has not come forward with evidence to support any one of these prongs. Rather, his entire claim is based on nothing more than his own self-serving and uncorroborated opinions, and Atrium is therefore entitled to summary judgment in its favor.

## I.    DR. HAYES HAS NOT COME FORWARD WITH ANY EVIDENCE THAT HE ENGAGED IN "PROTECTED ACTIVITY" UNDER THE FALSE CLAIMS ACT.

Under the False Claims Act, an employee engages in protected activity when he (1) takes action "in furtherance of" a *qui tam* action or (2) makes "other efforts to stop 1 or more violations" of the False Claims Act. 31 U.S.C. § 3730(h)(1). It is undisputed that Dr. Hayes did not take any actions "in furtherance of" a *qui tam* action prior to his termination. Indeed, he did not refer his purported concerns to the federal government until approximately two years after his termination. (Ex. 1, Hayes Dep. at 7-11, 135-36). *See Patt v. Greer Laboratories, Inc.*, Civ. Action No. 5:13-CV-00110-KDB-DSC, 2019 WL 3987762, at *10 (W.D.N.C. Aug. 22, 2019). Instead, Dr. Hayes claims that he made "other efforts to stop 1 or more violations" of the False Claims Act. There is no evidence, however, that supports this claim.

In considering whether an employee took "other efforts to stop" a False Claims Act violation, the Fourth Circuit applies an "objective reasonableness" standard. *See Grant*, 912 F.3d at 201. "Under this standard, an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the [False

Claims Act]." *Id.* To prove that he had an objectively reasonable belief, Dr. Hayes must come forward with evidence "to show that he believed [Atrium] was violating the [False Claims Act], that his belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the [False Claims Act]." *Id.* at 201–02. In other words, Dr. Hayes must prove that (i) he subjectively believed Atrium was committing a fraud against the government, and (ii) that this belief was objectively reasonable. *See id.*

In addition, Dr. Hayes's efforts "must have a nexus to a[] [False Claims Act] violation." *See Patt*, 2019 WL 3987762, at *10. "Merely expressing concerns about regulatory non-compliance is insufficient; [rather,] the [plaintiff's] complaints must allege specific, illegal, fraudulent conduct against the government." *Id.*

In this case, Dr. Hayes could not have had an objectively reasonable belief that Atrium was violating the False Claims Act. Dr. Hayes did not approach any outside lawyer or anyone with the government about any concerns he had with Atrium's practices until two years after his termination. (Hayes Dep. (Ex. 1) at 7-9, 77-78, 82, 133-36.) Rather, Dr. Hayes claims that he engaged in "protected activity" by reporting his concerns up the chain of command. (Hayes Dep. (Ex. 1) at 134.) In particular, Dr. Hayes claims he raised the following concerns with Atrium management (albeit not with the people who actually made the decision to terminate him): (1) Atrium's decision not to consolidate post-transplant patient care in one location, (2) Atrium and Metrolina's alleged double-billing Medicare for the same services, and (3) Atrium's alleged noncompliance with Medicare's 340B drug program. None of these complaints constitute "protected activity," however, because Dr. Hayes had "no specific facts or information on which to base his suspicion of billing fraud." *Elkharwily v. Mayo Holding Co.*, 84 F. Supp. 3d 917, 926

(D. Minn. 2015) aff'd, 823 F.3d 462 (8th Cir. 2016) (granting summary judgment in favor of employer on False Claims Act Retaliation claim).

> **A. Dr. Hayes's purported concern that not consolidating post-transplant care at a single location amounted to a fraud against the government was not objectively reasonable.**

Dr. Hayes has admitted that his concern with respect to the consolidation of all post-transplant care was because he believed it was better for patient care, not that Atrium was defrauding the government. (Hayes Dep. (Ex. 1) at 37-40, 114, 131-32.) Indeed, he expressed concerns about post-transplant care being provided in different locations before he even came to Atrium in 1993. (Hayes Dep. (Ex. 1) at 37-40, 114, 131-32.) There is no evidence that any complaints by Dr. Hayes about Atrium's decision not to consolidate the post-transplant clinic were "designed to stop one or more violations of the [False Claims Act]."

Indeed, Dr. Hayes does not, and cannot, connect Atrium's decision not to consolidate the post-transplant clinic with any false claims submitted to the government or any payments made by the government. Dr. Hayes has not come forward with any evidence of a single false claim for payment that was submitted to the government as a result of Atrium's decision not to consolidate the post-transplant clinic. *See Fakorede v. Mid-South Heart Center, P.C.*, 709 F. App'x 787, 790 (6th Cir. 2017) (dismissing retaliation claim where plaintiff failed to show that he understood the connection between the False Claims Act and the Anti-Kickback Statute and Stark Law, that his activity was motivated by this connection, or that even a single Medicare claim was submitted by his employer during this time).

And, to the extent that Dr. Hayes argues that he believed the Medicare Cost Reports submitted to Medicare for reimbursement after Atrium submitted its Mitigating Factors Request constituted a false claim, Dr. Hayes has admitted that he has never seen the Medicare Cost

Reports and had "no clue as to what was going on the cost report." (Hayes Dep. (Ex. 1) at 74-75, 128-29.) As such, he cannot allege a suspected False Claim Act that he was attempting to stop. *Skibo*, 2021 WL 72124, at *6-7 (affirming trial court's order granting summary judgment on behalf of employer on False Claims Act Retaliation claim where plaintiff had raised claims about potential regulatory violations but had not raised an issue of fraudulent conduct beyond the alleged regulatory violation that would constitute a False Claims Act violation).

Next, Dr. Hayes could not have reasonably believed there was anything misleading in the Mitigating Factors Request's statement that Atrium was "currently evaluating options and working on a plan to consolidate care in one location for all aspects of post-transplant patient management;" in fact, Dr. Hayes admits this was true. (Hayes Dep. (Ex. 1) at 109-11.) At best, Dr. Hayes's testimony can establish only that he raised concerns about whether Atrium had "told [the government] we would do certain things" [i.e. consolidate post-transplant care in a single location], and it had not yet done so. (Hayes Dep. (Ex. 1) at 37.) But Dr. Hayes has not, and cannot, point to any evidence of false or fraudulent conduct that would constitute a False Claims Act violation.

Finally, Dr. Hayes could not have reasonably believed that this statement was material to CMS's decision to approve Atrium's continued eligibility for reimbursement from Medicare. In order to constitute a False Claims Act violation, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." *Universal Health Servs., Inc. v. U.S. ex rel Escobar*, 136 S. Ct. 1989, 2002, 195 L. Ed. 2d 348 (2016). In this respect, Dr. Hayes could not have objectively believed that Atrium's failure to consolidate the post-transplant clinic was material to the government's payment decisions. First, Dr. Hayes knew that CMS had flagged Atrium based on outcomes, but that

16

Atrium had nonetheless already improved its outcomes to be in compliance by the time it received the Notice of Deficiency. (Hayes Dep.(Ex. 1) at 86-87, 92-93.) Second, evaluating options for consolidating post-transplant care at a single location was just one of numerous items Atrium identified to potentially improve patient outcomes, and Atrium had already implemented many improvements by the time it submitted its Mitigating Factors Request. (Hayes Dep. (Ex. 1) at 92-107, Ex. 7.) And CMS expressly told Atrium that it was "[o]n this basis" [i.e., the "implemented corrective actions to address the identified causes of poor outcomes"] that "continuation of Medicare participation [was] warranted. (McCanna Dep. (Ex. 4), Ex. 45.) There is simply no reasonable basis for Dr. Hayes to believe that Atrium's decision not to consolidate the post-transplant clinic after telling CMS that it was "considering" options for doing so was material to Medicare's approval of Atrium's Mitigating Factors Request. *See Escobar*, 136 S. Ct. at 2003.

### B. Dr. Hayes's purported concern that Atrium and Metrolina were double-billing Medicare for post-transplant care was not objectively reasonable.

Dr. Hayes could not have had an objectively reasonable belief that Atrium and Metrolina were double-billing Medicare for post-transplant services because he had no knowledge of either of their billing practices. As for Atrium's billing practices, Dr. Hayes admitted having "no clue as to what was going onto the cost report." (Hayes Dep. (Ex. 1) at 74-75, 128-29.) As for Metrolina, Dr. Hayes was not employed by Metrolina and had no knowledge about its billing practices. In short, Dr. Hayes has "no specific facts or information on which to base his suspicion of billing fraud." *Elkharwily*, 84 F. Supp. 3d at 926. With no knowledge of Atrium or Metrolina's billing practices, Dr. Hayes can only speculate that False Claims Act violations were occurring.

17

Dr. Hayes's unfounded and incorrect speculation that Atrium or Metrolina could be submitting false bills to Medicare, however, does not satisfy the objective reasonableness standard. Put simply, without having any knowledge of Atrium's or Metrolina's respective reimbursement requests from Atrium, Dr. Hayes could not have had an objectively reasonable belief that False Claims Act violations were occurring. *See Simon v. HealthSouth of Sarasota Limited Partnership*, 2021 WL 533539, at *8 (M.D. Fla. Feb. 12, 2021) (no objectively reasonable belief that employer was violating the False Claims Act where employee did not know what employer was billing to the government).

### C. Dr. Hayes's purported concerns about Atrium's regulatory compliance with 340B conditions do not give rise to an objectively reasonable belief of fraud against the government.

Dr. Hayes's alleged complaints about Atrium's noncompliance with the 340B drug pricing program conditions likewise are not protected activity because they do not concern fraud. "Allegations of regulatory violations are not enough 'in the absence of <u>actual fraudulent conduct</u>.'" *Skibo*, 2021 WL 72124, at *6. That is because the False Claims Act is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations. *Esocbar*, 136 S. Ct. at 2003 (citation and quotation omitted). Dr. Hayes makes no attempt to tie his alleged 340B compliance issues with any false claims submitted to the government. Thus, his alleged complaints about non-compliance with the 340B drug pricing program are not protected activity.

Moreover, Dr. Hayes had no personal knowledge of potential violations of the 340B conditions; he simply heard about it from someone else at a meeting. (Hayes Dep. (Ex. 1) at 126-30.) Dr. Hayes, however, cannot take "information he 'heard' from other employees that he had no personal knowledge of and assume[] . . . false claims were being submitted to the

government." *Myers v. EBI, L.P.*, No. 4:04-CV-86-H(2), 2006 WL 8438565, at *5 (E.D.N.C. Mar. 27, 2006) (granting summary judgment in favor of employer on plaintiff's False Claims Act Retaliation claim).

## II. DR. HAYES HAS NOT COME FORWARD WITH ANY EVIDENCE TO SUPPORT A FINDING THAT ATRIUM KNEW OF HIS ALLEGED "PROTECTED ACTIVITY."

Putting aside the other fundamental flaws in his case, Dr. Hayes has produced no evidence that the relevant decisionmakers at Atrium knew about his complaints to support his retaliation claim. "The law is clear that it is the decisionmakers' knowledge that is crucial." *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 848 (7th Cir. 2012). "[C]ompanies are not liable under the False Claims Act for every scrap of information that someone in or outside the chain of responsibility might have." *Id.*

Dr. Hayes has no evidence to support this knowledge element of his retaliation claim. The three individuals involved in the decision to terminate Dr. Hayes were Dr. Furney, Dr. Hall, and Paul Franz. But Dr. Hayes has produced no evidence that any of these individuals knew about any of his purported concerns, much less Dr. Hayes' concerns of Medicare billing fraud. In particular, Dr. Furney, the person who had led the investigation and ultimately recommended Dr. Hayes's termination, was entirely unaware of any discussions about whether to consolidate the post-transplant clinic at a single location, any concerns Dr. Hayes had about the relationship between Atrium and Metrolina, or Atrium's compliance with the 340B program. (Furney Dep. (Ex. 2) at 86-87, 90-92, 133; Hayes Dep. (Ex. 1) at 122). Similarly, Dr. Hall did not even personally know Dr. Hayes, and had no knowledge about the Notice of Deficiency that the kidney transplant program received from CMS or Atrium's response. (Hall Dep. (Ex. 5) at 44-48, 98.) And there is no evidence that Paul Franz had any knowledge of Dr. Hayes's purported concerns either. Finally, Dr. Hayes cannot identify a single written communication in which he

19

raised any of his purported "concerns" about a potential False Claims Act violation with anyone at Atrium.

Because Dr. Hayes has failed to come forward with any evidence that anyone involved in the decision to terminate him even knew about his purported concerns, his claim for Retaliation must fail. *Halasa*, 690 F.3d at 848 (affirming trial court's order granting summary judgment in favor of former employer because there was no evidence that any of the decisionmakers knew of the employee's alleged protected activity).

### III. DR. HAYES HAS NOT COME FORWARD WITH ANY EVIDENCE TO SUPPORT A FINDING THAT HE WAS TERMINATED AS A RESULT OF HIS ALLEGED "PROTECTED ACTIVITY."

In the Fourth Circuit, "a retaliation claim under the [False Claims Act] requires proof of 'but for' causation." *U.S. ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 177 (4th Cir. 2018). That is, Dr. Hayes must show that but for his purported "protected activity" [i.e., the concerns he purportedly raised about government fraud], he would not have been terminated. Dr. Hayes can meet his burden to prove "but-for causation" in one of two ways: (i) coming forward with direct evidence to make a prima facie case; or (ii) coming forward with rebuttal evidence establishing that Atrium's stated reasons for termination [i.e., his lack of presence, poor leadership, excessive vacation, and improper timekeeping] "were not its true reasons, but were a pretext for discrimination." *See id.* at 177-78. In either case, Dr. Hayes's "ultimate burden as to causation is the same" – he "must show that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of [Atrium]." *See id.*

Dr. Hayes has not produced any direct evidence of retaliatory animus. "Direct evidence is 'evidence or conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Cole v. Family Dollar Stores of Maryland, Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020). Dr. Hayes has not identified any

20

documents or elicited any testimony indicating that his termination was retaliatory. (Ex. 1, Hayes Dep. at 34.) Accordingly, Dr. Hayes must come forward with evidence that Atrium's stated reasons are "false" and that "retaliation was the real reason" for his termination.

In the absence of any direct evidence, in order to establish "but-for" causation, Dr. Hayes "must present evidence of circumstances that justify an inference of retaliatory motive." *Miller v. Instit. Of Defense Analyses*, 795 F. App'x 590, 596 (10th Cir. 2019) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)). Dr. Hayes has produced no such evidence.

In fact, Dr. Hayes does not even appear to have believed that there was a retaliatory motive until years after his termination, when his (second) lawyer told him that he believed there may have been a violation of federal law. (Hayes Dep. (Ex. 1) at 7-11, 135-36.) *See Patt*, 2019 WL 3987762, at *10 (granting summary judgment in favor of employer on plaintiffs' False Claims Act retaliation claim when plaintiffs were "discharged . . . long before [their] False Claims Act action was filed"). And, while Dr. Hayes now claims that he believes that Atrium terminated him in order to "keep him quiet," he testified that he repeatedly assured Atrium that he would not tell the government about his concerns. (Hayes Dep. (Ex. 1) at 39-41.) It simply does not make sense for Atrium to terminate Dr. Hayes to "keep him quiet" when he claims that he told them he would never report his concerns to the government. (Hayes Dep. (Ex. 1) at 77-79.) Indeed, if Atrium were concerned that he would report a claim to the government, why would it fire him?

Finally, Dr. Hayes claims he raised concerns about the transplant program being in two locations before he even came to Atrium in 1993 (Hayes Dep. (Ex. 1) at 37-40, 131-32), that he raised concerns about possible double-billing by Atrium and Metrolina for several years before his termination (Hayes Dep. (Ex. 1) at 133), and that he raised concerns about 340B in

connection with discussions about the possible consolidation of the post-transplant clinic that took place beginning in mid-2012 (Hayes Dep. (Ex. 1) at 126-27; McCanna Dep. (Ex. 4) at 165.) Yet, it was not until October 2013, after Dr. Furney had conducted a thorough review of Dr. Hayes's performance as Medical Director, that Atrium decided to terminate Dr. Hayes. The lack of temporal proximity between the time Dr. Hayes's purportedly raised his concerns and the date of his termination years later is, in and of itself, affirmative evidence of no causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (stating that "[a]ction taken (as here) 20 months later suggests, by itself, no causality at all"). Similarly, even if Dr. Hayes had raised his purported concerns closer in time to his termination, [t]emporal proximity alone is not sufficient to establish that [Dr. Hayes's] engagement in protected activity was a 'but for' cause of" his termination." *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014).

In short, this is not the tale of a whistleblower fired because he was sounding the alarm about fraud, but rather one of a disgruntled former employee concocting a fanciful narrative for his termination after the fact. Dr. Hayes cannot rely, however, on his own self-serving and uncorroborated opinion as to why he was terminated. With absolutely no evidence that he was terminated because of a retaliatory motive, or that Atrium's stated reason for his termination was pre-textual, Dr. Hayes' False Claims Retaliation Claim fails as a matter of law.

## CONCLUSION

For the reasons discussed above, Atrium asks the Court to grant its motion for summary judgment and enter judgment in its favor on Dr. Hayes's Retaliation claim.

This the 15th day of March, 2021.

**BRADLEY ARANT BOULT CUMMINGS LLP**

*/s/ C. Bailey King, Jr.*
Robert R. Marcus (NC Bar # 20041)
Bailey King (NC Bar # 34043)
Lyndsay E. Medlin (NC Bar # 49403)
Bradley Arant Boult Cummings, LLP
214 N. Tryon Street, Suite 3700
Charlotte, North Carolina 28202
(704) 338-6000 (Tel)
(704) 332-8858 (Fax)
rmarcus@bradley.com
bking@bradley.com
lmedlin@bradley.com

-AND-

Jason Paul Mehta (FL Bar # 106110)
Bradley Arant Boult Cummings LLP
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
(813) 559-5500 (Tel)
(813) 229-5946 (Fax)
jmehta@bradley.com

*Attorneys for Defendant The Charlotte-Mecklenburg Hospital Authority*

23

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 15, 2021, the foregoing **DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was served electronically by filing it with the Court's ECF system, which will send e-mail notification to the following counsel of record:

Charles H. Rabon, Jr.
Gregory D. Whitaker
RABON LAW FIRM PLLC
413 S. Sharon Amity Road, Suite C
Charlotte, NC 28211
crabon@usfraudattorneys.com
gwhitaker@usfraudattorneys.com

Joshua R. Van Kampen
VAN KAMPEN LAW, PC
315 E. Worthington Avenue
Charlotte, NC 28203
josh@vankampenlaw.com

This the 15th day of March, 2021.

*/s/ C. Bailey King, Jr.*
C. Bailey King, Jr.
*Attorney for Defendant The Charlotte-Mecklenburg Hospital Authority*